[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] CORRECTED MEMORANDUM OF DECISION
On July 17, 1998, Keriana T., age 2 1/2, was beaten and murdered by her mother's live-in boyfriend, C. He has been convicted of capital felony murder and sentenced to death. Five months after the murder, Keriana's mother, the respondent Virginia T., gave birth in prison to another child, Destiny Q. Destiny's father is C. In this proceeding the Department of Children and Families (DCF) seeks to terminate the respondent mother's parental rights to Destiny.
The respondent was born on June 12, 1979. In the words of her therapist, she is the product of at least two generations of women who were highly submissive, accepting of hostility, domination and control by a lover as part of his expression of love. She grew' up in poverty, not knowing her father and seeing her own mother using drugs and being abused by male companions. CT Page 15941-cq
Beginning at the age of three, the respondent was periodically abandoned by or removed from her mother and placed with relatives as her mother was repeatedly incarcerated. When she was seven years old, she was sent to live with her aunt, Maria H. Although the respondent felt that H. favored her own children, they have remained close over the years.[1]
When the respondent was in eighth grade and fourteen years old, she became pregnant. The baby's father, who was more than twice her age, abandoned her during the pregnancy. The respondent quit school and became involved with Francisco T., a drug dealer with a significant criminal record, including convictions for the sale of narcotics in 1994 and 1997, violation of probation, failure to appear, resisting arrest and threatening. The respondent and Francisco lived together for about three years, until Francisco went to prison on drug-related charges. He was still in prison at the time this petition was filed.
On October 6, 1995, at the age of fifteen, the respondent gave birth to Crystal T. Although Francisco was not Crystal's biological father, he assumed the role of her father. On October 6, 1994, the respondent gave birth to Tasha T. On January 27, 1996, the respondent gave birth to Keriana T. Francisco is the father of Tasha and Keriana. During their relationship, Francisco physically abused the respondent and at times struck the children.
In December 1997 or January 1998, shortly after Francisco had been sent to prison, the respondent rented a second-floor apartment at South Main Street in Waterbury where she moved with Crystal and Keriana. Tasha, who suffered from asthma, lived with Francisco's mother.
In late January or early February 1998, C., a seventeen or eighteen year old male, arrived at the respondent's apartment with a bag of wet clothes and announced that he had been in an argument with his mother. C. instructed the respondent to hang up his wet clothes. He then moved into the apartment without an invitation and without asking the respondent's permission. The respondent had no prior relationship with C. although she knew him to be an acquaintance of her brother. The respondent gave C., who spent much of his time out of the apartment, one of the three keys to the apartment. She kept one key for herself and gave another to her mother who was in prison.
For a few days, C. slept in the living room. On February 14, 1998, Valentime's Day, however, he bought the respondent flowers and they began a romantic relationship. C. then moved into the respondent's bedroom. In CT Page 15941-cr March 1998, the respondent became pregnant by C.
At this time, the respondent worked full time. Francisco's mother provided daycare for Crystal and Keriana. C., however, was not legally employed. The respondent had heard rumors that he was selling drugs. He also was receiving social security benefits related to his father's death. C. did not contribute to the expenses of the household and did not watch the children. The respondent was not angry about this and never asked C. to pay a share of the rent. She suspected that he was using cocaine. When she asked C. if he was using drugs he told her to mind her business.
C.'s treatment of the respondent during the period of time between January and May 1998 was, as characterized by the respondent, "normal." Until May 1998, the respondent periodically brought her daughters to visit Francisco in prison. This made C. jealous.
In April 1998, C.'s former girlfriend and her brother told the respondent, at different times, that C. had abused his former girlfriend. By the end of May 1998, C. had begun to physically abuse the respondent.[2]
In mid-June 1998, the respondent was laid off from her employment. On June 18, 1998, C. took away her keys to the apartment, had the telephone removed or disconnected and insisted that neither the respondent nor her children leave the apartment. Between June 18, 1998 and July 17, 1998, neither the respondent, nor Keriana or Crystal left the apartment. By mid-June 1998, C. paid the weekly rent and brought the family food as it was needed. Also, he began to physically abuse Keriana and Crystal. He also continued to physically abuse the respondent.
On June 20, 1998, the respondent received a visit in her apartment from H.[3] The respondent told H. that the children were not home but were at a relative's house. The two discussed that C. did not work but was paying some expenses, including the rent, and that he might be selling drugs. During the visit a noise came from another part of the apartment and the respondent ran from the room. H. left the apartment but returned when she remembered that she had forgotten to mention something to the respondent. Upon returning to the apartment, H. saw Crystal and observed that she had two bruise marks around both legs. The marks appeared to H. to be caused by squeezing. H. asked the respondent why she had said the children were not in the apartment. The respondent answered that it was the other children who were visiting relatives.[4]
CT Page 15941-cs
On this or an earlier occasion, H. confronted the respondent over her involvement with C. The respondent assured H. that she would not allow C. to hit her or the children. If he did so, the respondent told H., she would contact the police.
On another occasion, the respondent, by waving from a window, attracted the attention of Francisco's sister, Jeannette Feliciano, as she was driving on South Main Street. C., however, saw the respondent trying to get Feliciano's attention. He raced to the apartment ahead of Feliciano, sent the respondent to her bedroom and instructed her to be quiet. When Feliciano knocked on the door of the apartment, no one answered. C. then beat the respondent.
Between mid-June 1998 at the latest and the death of Keriana, on July 17, 1998, C. repeatedly beat both Keriana and Crystal. It was Keriana, however, who bore the brunt of C.'s abuse. He also continued to physically abuse the respondent. In order to convey the brutality of what occurred in the respondent's presence during this period, it is necessary to recite some instances of the abuse.
Toward the end of June 1998, the respondent, C., Keriana and Crystal planned to visit C.'s mother. As C was trying to put on her sneakers, Keriana, who at this time weighed about thirty-seven or thirty eight pounds, was being difficult. C. struck her on the side of her head with his knuckle. As a result, Keriana developed a lump on the side of her head.
C.'s beatings of Keriana continued. He would kick her while he was wearing sneakers. He also slapped and punched her with his hands. He beat her with a metal hair brush. When the respondent mentioned to C. that she had forgotten to bring the children to the hospital clinic for a scheduled appointment, C. struck the respondent and told her that he did not want her discussing the children with anyone.
C. would often beat Keriana when she soiled herself. On one occasion, he severely beat her with the metal buckle of a leather belt while Keriana was laying on the floor. The buckle caused the left side of the front of her head to bleed. When the respondent asked C. to stop, he stated that if the respondent was not quiet he would be more abusive toward Keriana. C. continued to strike Keriana with the belt about her body causing burn-like scars on the two year old. CT Page 15941-ct
C. later took Keriana to the bathroom shower and continued to beat her with the belt while it was wet. Because the lock on the bathroom door was broken, C. wedged a chair against the door so that the respondent could not enter. However, she could hear C. hitting her daughter and could hear her daughter crying loudly. The respondent pleaded with C. to stop. After several minutes, C. emerged from the bathroom. He sat on a sofa, put Keriana on the floor and for several more minutes squeezed and pulled Keriana's shoulders. As a result, Keriana sustained scars on her shoulders that resembled burn marks.
On July 14, 1998, Keriana was in her room, crying on the floor. C. entered the room, began hitting her and pulled her off the floor by her arm, breaking it. The respondent, who was in another room, heard Keriana crying and went to the child's room. When she arrived, she asked C. what had happened. C. responded that Keriana had failed to listen to him and that he had pulled her arm out of place as he was lifting her up. The respondent suggested that they take her to the hospital. C. refused because, he said, hospital personnel would see that he had inflicted injuries on Keriana's body. Instead, C. wrapped Keriana's arm in a bandanna.
That night, the respondent gave Keriana a shower. When the child raised her left hand, the respondent observed a bone protruding above Keriana's elbow. The area of the arm was swollen and there were what the respondent later characterized as "water bumps" or bubbles on the arm. C. popped these with his finger nails.
After her arm was broken, Keriana ate little and slept for long periods of time. On July 16, 1998, C. became angry when he found Keriana sleeping on her broken arm. He proceeded to punch her. The rings he wore on his hands made scratches in her face. Keriana's crying woke the respondent.
The following day, July 17, 1998, C. left the apartment in the morning. He returned at 12:30 p.m. and asked the respondent if she and her daughters wanted something to eat. The respondent answered that they did. C. departed and returned at 3:30 p.m. with food.
The respondent tried to feed her daughters. Keriana, however, refused to eat. When C. tried to stuff food into Keriana's mouth she vomited. C. told the respondent to give Keriana a shower. As the respondent was taking her daughter to the shower, C. changed his mind and insisted that he shower the child. He pulled Keriana, who no longer walked, into the bathroom and wedged the door shut with a chair. The respondent, however, CT Page 15941-cu could still see into the bathroom through an opening and screamed at C. to stop. C. grabbed Keriana by her hair and repeatedly hit her head against the shower wall. When Keriana fell to the ground, C. pulled her up by her hair. In doing so, he pulled hair out of the child's scalp, creating a bleeding wound. The respondent tried to gain entry into the bathroom but was unable to do so.
Eventually C. realized that Keriana was unconscious. He then allowed the respondent to enter the bathroom and ordered her to get into the shower with Keriana. When Keriana still did not respond, he instructed the respondent to take her into the living room. There, C. unsuccessfully attempted to resuscitate Keriana. C. told the respondent that he was leaving the apartment to find a telephone to call his mother. The respondent remained in the apartment with her two daughters.
After about five minutes C. returned. Ten minutes later his mother and stepfather arrived. C. told his mother that something had happened to Keriana that required that she be taken to the hospital. C. instructed his mother and the respondent that if anyone asked what had happened, they were to say that Keriana had fallen while riding a bicycle with her sister. Although the respondent wanted to hold her daughter, she allowed C. to take the child and give her to his mother.
C.'s mother and stepfather drove the respondent and Keriana to St. Mary's Hospital in Waterbury. When they arrived, at about 5:00 p.m., Keriana was in full cardiac arrest. Hospital personnel unsuccessfully attempted to resuscitate her. Shortly after 5:00 p.m., Keriana was declared dead.
Dr. Peter Jacoby observed that Keriana had scratches, bruises and gouge marks over her body. The gouges were especially extensive on the buttocks. She also had swelling of her left arm suggestive of fracture and a circular area of hair loss on her scalp consistent with a ripping out of hair. These injuries had been sustained within the last ten days. Jacoby concluded that Keriana had been beaten to death.
At the hospital, the respondent was upset and crying. She was not hysterical, however, and was able to talk in a relatively calm manner. She telephoned H. and asked her to come to the hospital. As a nurse was informing the respondent that Keriana had died, H. arrived. When H. asked the respondent what had happened, the respondent answered that Keriana had slipped in the shower, hit her head and also hurt her arm.
Sandra Baumister, a registered nurse, also asked the respondent what CT Page 15941-cv had happened to Keriana. The respondent answered Baumister essentially as she had H. Later in the evening Baumister again asked the respondent what had happened, emphasizing that the respondent should be exact in her explanation. The respondent repeated the same story. When Baumister specifically asked the respondent about the wounds on Keriana's buttocks, the respondent answered that Keriana had fallen off her bicycle. The respondent also ascribed other wounds Keriana had about her body to her propensity for falling.
Later that day, after learning of Keriana's death, Crystal's paternal grandmother took her to St. Mary's Hospital for an evaluation. Crystal was found to have suffered extensive contusions and abrasions over her body as a result of child abuse. According to the hospital record she had "an abrasion to the left cheek and contusion below the left eye. The whole face seemed slightly puffy with a slight eccyymosis below the right eye but mostly ecchymosis below the left eye. . . . There were also abrasions to the low back and upper buttocks region. They appeared to be several days to a week old and healing. There were multiple ecchymosis throughout the body including extensive eccyymosis to the right forearm, to the left chest (just above the nipple), to the right lower abdomen and the left lower abdomen, extending to the upper thighs bilaterally anteriorly. The left upper arm also exhibited ecchymosis. There were multiple belt marks to the back in a loop-type ecchymosis. . . ." Crystal, however, had suffered no broken bones.
Detective Howard Jones transported the respondent to the Waterbury Police Headquarters that evening. At headquarters the respondent gave a statement exculpating C. and reciting the story of Keriana's being injured in the shower. Unknown to the respondent, however, C. had given a statement admitting to having beaten Keriana. When the respondent was confronted with C.'s statement, she gave a second statement that inculpated C.
The respondent was arrested pursuant to warrants charging her with two counts of risk of injury in violation of General Statutes § 53-21 and one count of manslaughter in the first degree in violation of General Statutes § 53a-55.[5] She has been in pretrial incarceration since July 18, 1998. She remains incarcerated at the York Correctional Institution in Niantic. C. was arrested and charged with murder.
On December 1998, the respondent gave birth to Destiny. On December 18, 1998, DCF invoked a "ninety-six hour hold," taking custody of Destiny and placing her in the care of foster parents with whom she remains to this day. On December 22, 1998, the court granted DCF's petition for an CT Page 15941-cw order of temporary custody. The court also issued specific steps to the respondent. On March 2, 2000, the court adjudicated Destiny uncared for and committed her to the custody of DCF. The court also confirmed previously entered specific steps.
At the respondent's criminal arraignment in 1998, the court, Damiani,J., issued a protective order prohibiting contact between the respondent and her then two daughters, Crystal and Tash. On March 11, 1999, the court, Damiani, J., denied the respondent's motion to modify that order to permit her to visit with her children while in prison. The respondent did not appeal these orders.
On September 17, 1999, the respondent filed a motion in the Juvenile Division of the Superior Court for visitation with Destiny. On October 17, 1999, the court, Schuman, J., denied the motion without prejudice to the respondent's pursuing her administrative remedies. On January 19, 2000, at the respondent's request, DCF scheduled an administrative hearing to consider the issue of the respondent's visitation with Destiny. The request for a hearing, however, was dismissed upon DCF's receipt of the March 11, 1999 transcript of proceedings before Judge Damiani in which he had denied the respondent's motion to modify the protective order prohibiting contact between the respondent and her children. Neither DCF's dismissal of the respondent's request for a hearing on the issue of visitation nor Judge Damiani's orders were appealed.
On April 14, 2000, the respondent filed a motion with the Child Protection Session of the Superior Court court for visitation with Destiny. On April 27, 2000, the motion was marked "off" and rescheduled for the next hearing date. On July 6, 2000 the court, Schuman, J., retained jurisdiction over any motions for visitation. During the trial of this case, the court, Damiani, J., modified the protective order to remove any judicial prohibition against the respondent visiting with Destiny.
In 1999, both the respondent and C.'s mother were imprisoned at the York Correctional Center in Niantic. C.'s mother had been imprisoned for assisting C. in an escape from custody.[6] The respondent and C.'s mother, by sheer coincidence, were assigned the same prison cell. The respondent discussed this peculiar assignment with her prison counselor. The counselor informed the respondent the if C.'s mother caused her any problems the counselor would arrange for the respondent to be moved to another cell. The respondent never again raised the issue. During the time that C.'s mother was her cellmate, the respondent wrote letters to CT Page 15941-cx C. professing her love for him.
On April 11, 2000, DCF brought this petition to terminate the parental rights of the respondent and C. to Destiny.[7] The case against C. was tried to Judge Nicola Rubinow who rendered judgment terminating C.'s parental rights. The case against the respondent was tried to the undersigned over a period of eight days. Nineteen witnesses were examined and over fifty exhibits were admitted into evidence. Additional facts will be supplied as they are needed.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [and as such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001). "When petitioning to terminate parental rights without consent, [DCF] must allege and prove by clear and convincing evidence, one or more of the specific grounds set forth in General Statutes § 17a-112 (b) [now § 17a-112 (j)]. . . . The same evidence certainly can establish more than one ground for termination." (Citations omitted; internal quotation marks omitted.) Inre Kezia H., 33 Conn. App. 12, 16, 632 A.2d 1122, cert. denied,228 Conn. 915, 636 A.2d 847 (1993).
"In accordance with § 17a-112, [a] hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339,348, 776 A.2d 487 (2001).
 I
"As part of the adjudication process, § 17a-112 (c)(1) [now §17a-112 (f)] requires that the court find by clear and convincing evidence that the Department of Children and Families, has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . ." (Footnote omitted; internal quotation marks omitted.) In re Tabitha T., CT Page 15941-cy51 Conn. App. 595, 599, 722 A.2d 1232 (1999).
The respondent argues that DCF failed to use reasonable efforts to reunify because it failed to permit any visits between herself and Destiny, failed to permit telephone contact with Destiny and failed to deliver letters and gifts to Destiny that she sent from prison. DCF, however, does not claim that it used reasonable efforts to reunify the child with the respondent. Rather, as alleged in its petition, it claims that the respondent was unable or unwilling to benefit from reunification efforts because, since Destiny's birth, the respondent has been incarcerated at York Correctional Center and subject to a court order to not have any contact with her children. "It is clear from the statute that the reasonable efforts prong is satisfied where the court finds that the parent is unable or unwilling to benefit from reunification efforts. . . ." (Internal quotation marks omitted.) In re Amelia W.,62 Conn. App. 500, 504, 772 A.2d 619 (2001).
Reunification efforts generally consist of visitation and, where appropriate, other rehabilitative services such as evaluations, testing, counseling, therapy, education, medical care, parenting classes and housing assistance. See, e.g., In re Sheila J., 62 Conn. App. 470, 479,771 A.2d 244 (2001) (reasonable efforts included mother substance abuse evaluation and treatment, parenting skill classes, domestic violence counseling, a family reunification program, a psychological evaluation and visitation.); In re Mariah S., 61 Conn. App. 248, 257-58, 763 A.2d 71
(2000), cert. denied, 255 Conn. 934, 767 A.2d 109 (2001) (DCF "offered or facilitated psychological evaluations, psychiatric evaluation, the teen mentor program, individual therapy, weekly visitation and transportation to visits" as well as a psychological assessment and psychiatric evaluation.); In re Tabitha T., supra, 51 Conn. App. 601 (DCF offered respondent "psychiatric hospitalization, individual counseling, parenting classes, visitation and transportation. Foster care, visitation and counseling were also provided to the children.").
Since shortly after her arrest on July 18, 1998, the respondent has continuously been in the custody of the commissioner of corrections. See General Statutes § 54-53a. The commissioner of corrections is responsible for establishing "treatment, vocational and academic education" for the benefit of inmates. General Statutes § 18-81.[8]
Moreover, except for the period of time between the summer of 1999 and September 2000 the respondent has been held in a high security prison unit because of threats made to her life. For reasons of security, some programs normally available to other inmates are unavailable to inmates in this unit. CT Page 15941-cz
"It is axiomatic that the law does not require a useless and futile act." In re Antony B., 54 Conn. App. 463, 476, 735 A.2d 893 (1999). Because the respondent has at all times been in prison and in the custody of the commissioner of corrections, DCF was excused from providing her with reunification services other than visitation. In re Roshawn R.,51 Conn. App. 44, 57, 720 A.2d 1112 (1998) (together with other factors, the respondent's "frequent periods of incarceration prevented the petitioner form offering him services."); see also In the Interests ofEugene C., Superior Court, judicial district of Waterbury (January 15, 2001, Dewey, J.); In re Axavian F., Superior Court, child protection session at Middletown (December 19, 2000, Frazzinni, J.); In theInterests of Pedro G., Superior Court, judicial district of Middletown (September 27, 2000, Quinn, J.); In re Carmelo A., Superior Court, child protection session at Middletown (August 21, 2000, Quinn, J.); In reMichael W., Superior Court, child protection session at Middletown (July 28, 2000, Shapiro, J.); In the Interest of Takeyma R., Superior Court, judicial district of Middletown (March 17, 2000, Schuman, J.); In theInterest of Rocha B., Superior Court, judicial district of Middletown (November 9, 1999, Shapiro, J.); In the Interest of Sarah Ann K., Superior Court, judicial district of Middletown (January 28, 1999,Foley, J.), aff'd, 57 Conn. App. 441, 749 A.2d 77 (2000); In re SarahB., Superior Court, judicial district of Middletown (November 12, 1996,Dyer, J.)
The respondent's imprisonment, however, does not, in and of itself, excuse DCF from providing her with visitation with her child. In reHector L., 53 Conn. App. 359, 372, 730 A.2d 106 (1999); In re RoshawnR., supra, 51 Conn. App. 58-59; In the Interest of Derrick G., Superior Court, Child Protection Session at Middletown (August 15, 2000, Schuman,J.); cf. In re Shane P., 58 Conn. App. 234, 238, 753 A.2d 409 (2000). However, at the time of her arraignment, the court issued a protective order barring the respondent from visiting with her children. Although that order was not entered into evidence, a transcript of the hearing on the respondent's motion to modify the order was introduced.[9] While the original protective order apparently did not address contact with Destiny, who was as yet unborn, both the respondent's lawyer and the court treated the original order as applying to Destiny after her birth. When, on March 11, 1999, three months after Destiny's birth, the respondent moved to modify the original order, her motion was denied without prejudice by the court. There is no evidence that the protective order or the court's denial of the motion to modify were appealed nor is the validity of either order questioned here. CT Page 15941-da
The transcript of the denial of the motion to modify does not reflect whether or how far beyond prohibiting visits between mother and children the original protective order extended. The respondent complains that DCF prohibited her not only from visiting with Destiny but from telephoning her. Moreover, DCF failed to deliver letters and gifts that the respondent mailed Destiny from prison. Without the opportunity for visits, however, the respondent's telephone calls and letters would have served little purpose toward reunification with an infant such as Destiny who was less than two years of age[10] and had seen the respondent only briefly in her life.
As observed supra, "the law does not require a useless and futile act."In re Antony B., supra, 54 Conn. App. 476. Because the respondent has been incarcerated since Destiny's birth and because the court's protective order and denial of the respondent's motion to modify effectively prohibited all contact between the respondent and Destiny, the court finds by clear and convincing evidence that the respondent was unable to benefit from reunification services. Accordingly, DCF was excused from using reasonable efforts to reunite mother and daughter.
 II
DCF petitions to terminate the respondent's parental rights on two grounds. The first ground is that the respondent has failed to "achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes (Rev. 1999) §17a-112 (c)(3)(B), now codified as General Statutes (Rev. 2000) §17a-112 (j)(3)(B).
 A.
To terminate parental rights under this part of the statute, a court must find that: "the child (i) has been found . . . to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the CT Page 15941-db child. . . ." General Statutes § 17a-112 (j)(3)(B). Thus, this part of the statute is in two subparts. Each subpart requires different antecedent findings to the principal finding that the parent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." Id. In its petition, DCF seeks termination of parental rights under both parts.
Part i requires an antecedent finding by the Superior Court or Probate Court in a prior proceeding that the child has been neglected or uncared for. Part ii, enacted in 1998; Public Acts 1998, No. 98-241, § 8; requires three antecedent findings: (1) that the child is presently neglected or uncared for, which finding is made in the proceeding before the court, (2) that the child has been in the custody of the commissioner of children and families for at least fifteen months, and (3) that the parent of the child has been provided with specific steps to follow in order to regain custody of the child, pursuant to General Statutes §46b-129.
One effect of the 1998 amendment is that the court in a termination of parental rights proceeding can premise a finding of failure to rehabilitate on a contemporaneous rather than a prior finding of neglect or uncared for. See, e.g., In the Interest of Shyliesh H., Superior Court, Child Protection Session at Middletown (February 26, 1999,Schuman, J.), aff'd 56 Conn. App. 167, 743 A.2d 165 (1999).
The court finds that the antecedent requirements of both subparts have been established by clear and convincing evidence. Specifically, the court finds that on March 2, 2000, Destiny had been found by the Superior Court in a prior proceeding to be uncared for[11] that she had been in the custody of the commissioner of DCF for at least fifteen months, and that the respondent had been provided with specific steps to take to facilitate the return of Destiny to her, pursuant to § 46b-129.
The court also finds that as of the date of the petition, Destiny was uncared for. General Statutes § 46b-120 (9) provides that "a child or youth may be found `uncared for' who is homeless. . . ." As of the date of the filing of the petition, April 11, 2000, Destiny was sixteen months old. Both of her parents were incarcerated and unable to provide her with a home. Both of Destiny's grandmothers were incarcerated, and neither was otherwise fit to care for a toddler. Hernandez' home was determined to be unsuitable for Destiny, and no other relative has come forward as a resource. The court finds by clear and convincing evidence that as of the CT Page 15941-dc filing of the petition, Destiny was uncared for because she was homeless. See In re Shavoughn K., 13 Conn. App. 91, 92, 534 A.2d 1243
(1987), cert. denied, 207 Conn. 805, 540 A.2d 374 (1988); In re Interestsof Fatima McC., Superior Court, child protection session at Middletown (November 26, 1997, Quinn, J.); In re Oliver B., Superior Court, judicial district of Hartford-New Britain at Hartford (July 22, 1994, Foley, J.);In re Kelly S., Superior Court, judicial district of Tenth District at Willamantic, Docket No. N90-159 (December 5, 1991, Teller, J.); In reCornelia B., Superior Court, judicial district of Danbury, juvenile matters, Docket No. 528120 (April 29, 1990); compare Welfare Commissionerv. Anonymous (1976-10), 33 Conn. Sup. 100, 364 A.2d 250 (1976) (children not uncared for where, though mother in prison and father unable to care for them, they were being well cared for by grandaunt)
 B.
The court turns to the issue of whether the respondent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes § 17a-112 (j).
"Failure of a parent to achieve sufficient personal rehabilitation is one of [seven] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. . . . That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted.; internal quotation marks omitted.) InCT Page 15941-ddre Sheila J., supra, 62 Conn. App. 479-80.
DCF alleges that the respondent has a history of "engaging in unhealthy relationships" and that she "failed to protect Keriana and Crystal [T.], Destiny's half-siblings, [w]hile they were in her care and custody. Said failure resulted in the death of Keriana and the physical abuse of Crystal."[12] The respondent, on the other hand, argues that she was no less a victim of C.'s violence than were Keriana and Crystal, and was imprisoned by C. in their apartment, unable to obtain help for her children. In addition, the respondent denies that she has a history of engaging in relationships marked by domestic violence. The court agrees with the petitioner.
 1.
Preliminarily, the court observes that the failure of a parent to protect a child from harm and a parental history of engaging in relationships marked by domestic violence are parental deficiencies requiring rehabilitation which, if unsuccessful, may warrant the termination of parental rights.
"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) In re Deana E., 61 Conn. App. 185,193, 763 A.2d 37 (2000).
The failure to protect a child from known harm over a period of time undermines many of these parental obligations, most directly the expression of concern over the health and general well-being of the child, and the duty to supply necessary medical care. The Appellate Court has repeatedly found that the failure of a parent to protect a child may give rise to the termination of parental rights. See, e.g., In re AntonioM., 56 Conn. App. 534, 542-43, 744 A.2d 915 (2000) (act of omission or commission resulting in denial of care, guidance or control); In reTabitha T., supra, 51 Conn. App. 603 (same); In re Anna B.,50 Conn. App. 298, 302-03, 717 A.2d 289 (1998) (failure to rehabilitate and denial of care, guidance or control); In re Lauren R.,49 Conn. App. 763, 772, 774, 715 A.2d 822 (1998) (same); In re MarvinM., 48 Conn. App. 563, 566, 711 A.2d 756, cert. denied, 245 Conn. 916,719 A.2d 900 (1998) (failure to achieve rehabilitation); In re FeliciaCT Page 15941-deD., 35 Conn. App. 490, 501, 646 A.2d 862, cert. denied, 231 Conn. 931,649 A.2d 253 (1994) (denial of care by reason of acts of omission or commission); see also In the Interests of Mark R., Superior Court, Child Protection Session at Middletown (Dec. 4, 1998) (Quinn, J.); In re DavidW., Superior Court, Child Protection Session at Middletown (May 16, 1997) (Foley, J.), aff'd 52 Conn. App. 576, 586, 727 A.2d 264, cert. denied,249 Conn. 908, 733 A.2d 225 (1999).
With respect to domestic, or family, violence, the legislature has clearly spoken. General Statutes § 17a-106b (a) declares: "The state of Connecticut finds that family violence can result in abuse and neglect of the children living in the household where such violence occurs and that the prevention of child abuse and neglect depends on coordination of domestic violence and child protective services." In other legislation as well, the General Assembly has recognized that domestic violence in the home adversely affects children. See, e.g., General Statutes §§17a-106c, 46b-38g.[13]
A parent's propensity to engage in relationships marred by domestic violence is an oft-cited fact in findings of failure to rehabilitate and termination of parental rights. See, e.g., In re Daniel C., supra,63 Conn. App. 342, 345, 354-55; In re Sheila J., supra,62 Conn. App. 480-81; In re Stanley D., 61 Conn. App. 224, 232, 763 A.2d 83
(2000); In re Steven N., 57 Conn. App. 629, 631, 749 A.2d 678 (2000); Inre Michael L., 56 Conn. App. 688, 691, 745 A.2d 847 (2000); In re AntonyB., supra, 54 Conn. App. 475; In re Galen F., 54 Conn. App. 590, 596,737 A.2d 499 (1999); In re Danuael D., 51 Conn. App. 829, 834, 724 A.2d 546
(1999); In re Helen B., 50 Conn. App. 818, 821, 830, 719 A.2d 907
(1998); In re Jessica B., 50 Conn. App. 554, 563, 718 A.2d 997 (1998).
 2.
The court addresses certain factual disputes between the parties.
 a.
The respondent denies that she has a history of unhealthy, violent relationships. Specifically, she disputes DCF's claim that her relationship with Francisco was marked by violence. The court disagrees.
The court credits the testimony of Dr. Robert Meier, Ph.D., one of two experts appointed by the court to evaluate the respondent, that the respondent told him that there indeed was such abuse. The court does so for six reasons. CT Page 15941-df
First, the statements were made to Meier prior to the filing of the instant petition. Before the filing of this petition, the respondent had little reason to fabricate the details of her relationship with Francisco. Subsequent to the filing of the petition, it was in her interest to deny that she had a relationship with a man, prior to her relationship with C., that was abusive.
Second, the account by the respondent to Meier of her relationship with Francisco was replete with details of the abuse. Meier relates the respondent's account of that relationship in his report as follows: "At first the relationship was all right, then he became abusive to her. The abuse was described as both physical and emotional. [Francisco] would reportedly pull her hair, kick her, and become mentally abusive. He was using drugs the last year of the relationship, and the abuse got worse, although it occurred throughout the relationship. They reportedly broke up due to the abuse. Mother denied that she ever got medical care, however. On one occasion, [Francisco] tried to choke her. This occurred in his mother's house. When he stopped choking her in order to go get a knife, the grandmother told [the mother] to run out of the apartment. Mother said grandmother and an aunt witnessed this incident. . . . In addition, [the mother] reported that when he was under the influence of drugs, [Francisco] also abused the children by hitting them with a belt."
Third, Meier comported himself before the court as a careful person, meticulous about detail. Fourth, Meier had no motive to falsify his account. Little other factual material in his reports was challenged. Fifth, the respondent's statements to Meier were corroborated in important respects by the respondent's statement to DCF social worker Sandra Tapia, to whom the respondent stated that Francisco used drugs, hit the children and struck her during their relationship. Sixth, the respondent told Dr. Roy A. Nisenson, Ph.D., the psychologist she retained as her expert in this case, that Francisco hit her, albeit only occasionally. Moreover, Nisenson opined that while these assaults may not have inflicted physical injury on the respondent, they did cause her to suffer psychological damage.
That the respondent did not report such abuse to the police at the time is unremarkable. The same fears, behaviors and limitations that allowed her to submit to such abuse ordinarily would rule out even discussing it with government authorities.
As the respondent herself later admitted to Meier, she "needs CT Page 15941-dg counseling and parenting classes. . . . While she loves her children, she needs the counseling before she could take the step of caring for them. When asked what she hoped to get from counseling, [she] responded thatshe has always seen abuse, and just thought it was the way it needed tobe. . . . She then commented that she thought she was a good mother, but needs to get it out of her mind that the abuse needs to happen. As far as parenting classes are concerned, she felt that she had never learned parenting because of the way she was raised." (Emphasis added.) In August 2000, she repeated essentially the same statements to Dr. Barbara Berkowitz, another court-appointed psychologist. According to Berkowitz' report, the respondent "reported that she believed that male partners beating females was the norm, what she had always seen, and that it was the women's fault when it happened." (Exhibit 4, p. 7) The court finds that the respondent has a history of relationships marked by domestic violence.
 b.
DCF also argues that the respondent failed to protect her daughters, Keriana and Crystal, from C. The respondent argues that she attempted to protect them, that she was locked in her apartment by C. and was as much a victim of C.'s violence as were her daughters. The court agrees with DCF.
The respondent permitted C., a person she barely knew, to reside in her apartment with her daughters, and obtain control over every aspect of her life including her responsibility to care for and protect her daughters. She continued a romantic relationship with C. even after she was repeatedly warned that he had been violent with his former girlfriend. After C. began abusing her she not only remained with him but failed to disclose his abuse to her family, friends or co-workers.[14] Even when H. visited the respondent in her apartment and confronted her with C.'s propensity for domestic violence, she undertook a cover-up. When C. viciously assaulted her two infant daughters, she sought the help of neither family or friends. Even when she knew that her children were in need of medical assistance, she did not attempt to obtain it for them.
As Meyer observed in his interview with the respondent in early 1999,
 When asked about her relationship with [C.], and her judgment regarding the abuse, she responded that she did not think it would get to this. But when he got violent, she was frightened and would try not to bother him. [The respondent] felt that if she tried to CT Page 15941-dh leave, things would have gotten worse. She added that she never had any chance to leave.
 When asked why the children were never treated for previous injuries, mother responded that [C.] would not permit it. He would merely tell her that the children were all right. Mother admitted that she felt the children should go to the hospital after they were injured, especially Keriana, but if she mentioned this, [C.] would hit her. She did not have a telephone, and he would not let her go out "when this happened. . . ."
 She spoke of times when she was with other people or when [C.] was not present, and there was no immediate danger to her, yet her dependency and self-interest inhibited her from taking responsible action. (Exhibit 5, pp. 8-9)
Moreover, the respondent was not physically imprisoned in her apartment from mid-June to mid-July, as she claims. She indeed was restrained by C.'s beatings of her and her daughters, by his command that she not leave the apartment, by his threats and especially by her timidity and passivity. Neither in her statements to the police in 1998 nor in her statements to Meier in 1999, however, did the respondent state that she was locked in her apartment, a fact she would have naturally mentioned if it were so. Indeed, not until 2000 does this claim appear in a report by her prison counselor, Michelle May. Prior to that time her claim was that C. kept close surveillance on the apartment, beat her when she attempted contact with Feliciano and threatened to beat her if she attempted to leave. The court finds that the respondent failed to act reasonably in failing to attempt to seek help for her daughters.
South Main Street is a major roadway in Waterbury. In the area of the respondent's apartment it is a two-way street with sidewalks on both sides. The respondent's apartment was located in a mixed commercial-residential area. The area is, in the words of the respondent's own investigator, "fairly busy." The respondent's apartment was located above a night club. Across the street was a restaurant, a grocery store and a music store. There was pedestrian traffic of South Main Street in front of her apartment.
The respondent's apartment had seven windows. Four of these windows faced South Main Street and opened. Other windows faced another building CT Page 15941-di to the side and some were boarded. However, at least one window on the side of the apartment opened onto a second story roof or landing that was only eight feet above ground level.
Not only did H. enter the apartment during the period the respondent now claims to have been imprisoned in it, but the respondent could have opened her second floor window and called out to the denizens of South Main Street for help or to summon the police. She also could have enabled her children to escape onto the landing on the side of the building and from there to the ground where a bystander could have received them and called the police. There is no reason to believe that such rescue efforts would been futile. C., a teenage drug dealer, was usually out of the apartment. The court does not credit the respondent's claim that C. maintained a constant surveillance of the apartment.
Although it is true that the respondent was indeed a victim of the terror unleashed by C. and reasonably feared C.'s response to a call by her for help, such a fear is no excuse for her failure to try to protect her children. The law justifiably requires a great deal of a parent in the discharge of the duty to protect one's children. Nothing less than the survival of the species and the health of society depends on it. "It is indisputable that protecting the physical and psychological well-being of children is a compelling, as well as legitimate, state interest. . . . A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens. . . ." (Citation omitted; internal quotation marks omitted.) In re Shane P.,58 Conn. App. 244, 260, 754 A.2d 169 (2000). Moreover, a young child is unable to evaluate her own condition and summon aid and is, therefore, inherently dependent on the parent for obtaining help in the event of danger. State v. Miranda, 245 Conn. 209, 222, 715 A.2d 680 (1998), on remand, 56 Conn. App. 298, 742 A.2d 1276, cert granted, 252 Conn. 935,936, 747 A.2d 5 (2000).
If the parental duty to protect one's children is to effectual, it must continue even when its discharge is very inconvenient, indeed hazardous. The frequency with which parent and child are in physical proximity will result in instances where the parent and the child are in danger together. That coincidence, however, does not relieve the parent of the obligation to act reasonably to protect the child. The respondent here clearly did not do so. While the respondent herself was also struck by C. during the time period that Keriana and Crystal were being assaulted, any such beatings were not so severe as to disable her from opening a window and calling for help.[15] Nor was the respondent in danger of loss of her life. To be sure, the respondent's overall plight evokes CT Page 15941-dj sympathy. But sympathy is an insufficient basis on which to base either a finding or a rule of law. Cf. DeShaney v. Winnebago Department of CountySocial Services, 489 U.S. 189, 202-203, 109 S.Ct. 998, 103 L.Ed.2d 249
(1989). The legislature has directed that "the provisions of [§17a-112] shall be liberally construed in the best interests of any child for whom a petition under [that] section has been filed"; General Statutes § 17a-112 (p); and "[a]s judges, it is our sworn responsibility to apply the law in an objective, reasoned and dispassionate manner." State v. Johnson, 253 Conn. 1, 81, 751 A.2d 298, reconsideration denied, 254 Conn. 909, 755 A.2d 880 (2000).
The respondent should have but did not act in a way reasonably calculated to protect her children. Her conduct was a gross deviation from the standard of conduct that a reasonable person would observe, even in the respondent's circumstances.
 C.
The following additional facts are necessary for the disposition of the petitioner's claim of failure to rehabilitate. Since the day after Keriana's death, the respondent has been incarcerated in York Correctional Center. The year following Keriana's death, the respondent wrote to C. professing her love for and loyalty to him. The respondent argues that she was coerced by C.'s mother, her cell mate, into writing the letters and that the sentiments expressed therein do not reflect her true feelings.
The respondent cannot escape the responsibility for the letters to C. by now claiming that she was coerced by C.'s mother. Her prison counselor offered to relocate her if this arrangement was problematical. Either her letters to C. were an accurate expression of her feelings, reflecting her perverse need for the love of her daughter's murderer, or they were the product of extraordinary passivity and the absence of will. Either way, the letters reflect a pathology disqualifying her, at that time, from parenting her children.
In February or March of 1999, Meier conducted a psychological evaluation of the respondent. In her interview with Meier, the respondent, after recounting the abuse visited on her and her children by Francisco, opined that if he were not using drugs, he would be capable of caring for her children. As Meier observed, "[t]his was a strange response after she had accused him of abusing the children and having tried to kill her." (Exhibit 5, p. 5) CT Page 15941-dk
Meier inquired about the respondent's relationship with C. and her judgment in responding to his abuse. The respondent answered the "she did not think it would get to this. But when he got violent, she was frightened, and would try not to bother him. [The respondent] felt that if she tried to leave, things would have gotten worse. She added that she never had any chance to leave.
"When asked why the why the children were never treated for previous injuries, [the respondent] responded that Mr. [C.] would not permit it. He would merely tell her that the children were all right. [The respondent] admitted that she felt the children should go to the hospital after they were injured, especially Keriana, but if she mentioned this, Mr. [C.] would hit her. She said she did not have a telephone, and he would not let her go out `when this happened.'
"When mother asked how she felt when she sees Mr. [C.] in court she responded that she hurts in every way, and asking herself, `How could he do this to me?' She feels she was not responsible, and that there was nothing she could do." (Emphasis added; exhibit 5, p. 8)[16]
In Meier's opinion, the respondent's personality profile "suggested some defensiveness and denial," a profile that was "consistent with those who have a history of family problems. . . . Such people are impulsive and unable to delay gratification of their impulses. There tends to be little respect for social standards and values.
"Such individuals are often frustrated by their own lack of accomplishment, and resent any demands placed upon them. . . . Beneaththe facade of competency and assertiveness, it is likely there are strong feelings of inadequacy and self-dissatisfaction." (Emphasis added.) (Exhibit 5, p. 8)
Meier observed that the respondent "spoke of times when she was with other people or when Mr. [C.] was not present, and there was no immediate danger to her, yet her dependency and self-interest inhibited her from taking responsible action." (Exhibit 5, pp. 8-9)
In Meier's opinion, the respondent had failed to demonstrate sufficient judgment or responsibility to provide for the needs of her children and it was unlikely any planned interventions could correct that situation adequately. The respondent, in Meier's opinion, could not achieve rehabilitation within a reasonable time, considering the needs and ages of the children. (Exhibit 5, p. 11) CT Page 15941-dl
On December 30, 1999, the respondent began counseling in prison with Michelle May, a marriage and family therapist. She also began attending classes to get her GED and attended parenting classes.
In early 2000, May wrote an assessment of the respondent discussing her history and opining that the respondent "has managed to identify survival strategies to cope with being retained in a women's [prison]. She has been existing on her prayers and the hope provided to her by the continued philanthropic efforts of a local businessman. She welcomed therapy for herself. She immediately set goals. She cooperates fully with requests made of her by the legal/investigating/therapeutic professionals presently involved. She attends school in prison in an effort to obtain her GED. . . . She is receiving other career training as well. She describes her strategy for survival as keeping to herself, following the rules, keeping exercised and ultimately by going to church, wearing her Rosary and praying to God. She has made several requests to the prison personnel for group therapy, none of which have been granted to date.
"Many strengths were noted at the first interview. She identified her survival strategies, she expressed her goal of being reunited with her children and becoming independent when she leaves prison. She plans to continue with therapy to resolve her issues. She managed to discharge the first attorney that had been appointed to her expressing to the court her disappointment with his efforts. . . . She is pursuing visitation with Destiny. She requested parenting assistance from her therapist." (Exhibit F, pp. 8-9)
Shortly before the filing of the petition, Dr. Nisenson performed a psychological evaluation and testing of the respondent on her behalf. In his report of that evaluation, Nisenson found the respondent to be suffering from moderate to severe clinical depression and anxiety, as well as "mild" battered women's syndrome and post traumatic stress disorder. He stated that the respondent had a learning disability and that the "[l]imitations in [her] raw intellectual capacity result from traumatic brain damage." At Nisenson's request the respondent made human figure drawings that included a picture of her and C., both smiling.[17]
Nonetheless, Nisenson, in April 2000, determined that the respondent's "functioning is remarkable despite no treatment until December 30, 1999."
A product of several generations of women expected to be highly submissive, accept hostility, domination and control by a lover as part of an expression of love, the respondent saw her own mother's use of CT Page 15941-dm drugs and abuse by men. The respondent was abandoned by her mother at an early age and shuffled among relatives. The respondent engaged in sexual relations at a very early age in her own effort to acquire male love at any cost. The result was the premature end of her childhood and the onset of motherhood. She hardly experienced social adolescence at all. By the age of seventeen she had given birth to three daughters and was involved in a relationship with an abusive drug dealer. When he was imprisoned, she passively allowed C., another drug dealer whom she did not know, to walk into her life, and to abuse herself and her children. To be sure, she was a victim of C.'s abuse, but she allowed herself to become a victim. Instead of calling out for help, she witnessed the beatings of her daughters and the murder of Keriana. Less than a year later, she wrote to her daughter's murderer, professing her love for him.
The court is not persuaded that in little more than three months of counseling before the filing of the petition, the respondent achieved any appreciable degree of rehabilitation in her ability to parent Destiny.[18]
Destiny is now three years old, unable to protect herself from abuse and has never known anything but foster care. "At the adjudicatory phase of the termination hearing, the ultimate issue faced by the trial court [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the child['s] commitment." (Footnote omitted.) In reHector L., supra, 53 Conn. App. 367. By clear and convincing evidence, the court finds that as of the filing of the petition, the respondent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes § 17a-112 (c)(3) (B)
 III
DCF also alleges that the respondent's parental rights should be terminated based on the portion of General Statutes (Rev. to 1999) §17a-112 (c)(3)(F), now § 17a-112 (j)(3)(F) (hereafter, ground F), which authorizes termination of parental rights where "the parent has killed through deliberate, nonaccidental act another child of the parent or has requested, commanded, importuned, attempted, conspired or solicited such killing or has committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent. . . ." (Emphasis added.) DCF relies on the italicized portion of the statute. The word "act," used as a noun, appears twice in ground F, in connection with the killing of a child and the assaulting of CT Page 15941-dn a child. It is the interpretation of this word that is pivotal to DCF's claim under ground F.
DCF claims that the respondent had a duty to act to protect her children and that her failure to protect them makes her liable for the assaults committed by C. DCF's argument is based on State v. Miranda, supra, 245 Conn. 209, in which the Supreme Court held that "criminal conduct can arise not only through overt acts, but also by an omission to act when there is a legal duty to do so." Id., 217.
In Miranda, the defendant had been convicted of assault upon his stepchild. Id., 211. The defendant did not directly perpetrate the assault but did, however, allow the victim's mother to abuse the child. The defendant, who was not the victim's father, "took care of [the children] and. considered himself to be their stepfather." Id., 213. The Supreme Court upheld the conviction, noting that "[t]he trend of Anglo-American law has been toward enlarging the scope of criminal liability for failure .to act in those situations in which the common law or statutes have imposed an affirmative responsibility for the safety and well-being of others." Id., 215. The court found that "[i]t is undisputed that parents have a duty to provide food, shelter and medical aid for their children and to protect them from harm" and that because the stepfather considered himself to be the victim's father, he committed an assault by breaching his duty towards his stepchild when allowing the victim's mother to physically abuse the child. Id., 222, 226.
The "resolution of this issue is, at bottom, a matter of statutory interpretation. The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.)Church Homes, Inc. v. Administrator, Unemployment Compensation Act,250 Conn. 297, 304, 735 A.2d 805 (1999).
"We turn first to the legislative history of what is now [§ 17a-112
(j)(3)(F)]." Groppo v. Jacks, 210 Conn. 277, 281, 554 A.2d 1061
(1989). This ground of Connecticut's parental termination statute was enacted in 1998. Public Acts 1998, No. 98-241, § 8. Just as the CT Page 15941-do legislature has enacted certain other parts of our termination statute in order to take advantage of funding available to the states upon compliance with the Federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq.; In re Baby Girl B., 224 Conn. 263,289, 618 A.2d 1 (1992); so too, the legislature enacted ground F of General Statutes § 17a-112 (j)(3) to bring our termination statutes in harmony with an amendment to that act, the Adoption and Safe Families Act of 1997, and thereby to expedite the permanent placement of children. In re Sheneal W. Jr., 45 Conn. Sup. 586, 591-92, 728 A.2d 544
(1999); 42 U.S.C. § 671 (a) (15), 675(5)(E).[19] While there are references in the history to a desire to address "egregious cases"; 41 H.R. Proc., Pt. 12, 1998 Sess., p. 4165 (remarks of Representative Christel Truglia); and "acts of a heinous nature"; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1998 Sess., p. 1860 (remarks of Attorney Linda Pierce Prestley, State Child Advocate); the court finds the legislative history unilluminating of the issue here.
Similarly, the circumstances surrounding the enactment of ground F shed no light on the meaning of "act" in the statute. While various legislators and witnesses discussed certain recent cases involving scenarios they wished the legislation to address, none of those cases involved an attempt to terminate the parental rights of a parent based solely on the ground of failure to protect the parent's child.[20]
Nor is resort to the common law helpful. Connecticut's termination of parental rights statute has no common law antecedent. The "termination of a parent's rights to his or her children was unknown to the common law. Termination is a creature of state statutes." (Internal quotation marks omitted.) In re Eden F., 48 Conn. App. 290, 321, 710 A.2d 771, rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1998), rearg. denied,251 Conn. 924, 742 A.2d 364 (1999), quoting 3 D. Kramer, Legal Rights of Children (2d Ed. 1994) § 28.01, p. 4. of course, a parent has a common law duty to provide medical aid to his or her children and to protect them from harm. State v. Miranda, supra, 245 Conn. 222. But this does not materially illuminate whether, in using the word "act" in ground F, the legislature intended to include a failure to act.
"Accordingly, we turn to the language of the [statute]"; Giaimo v. NewHaven, 257 Conn. 481, 509, 778 A.2d 33 (2001); "which must be read contextually." State v. Jason B., 248 Conn. 543, 550, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S.Ct. 406, 145 L.Ed.2d 316 (1999). Section 17a-112 (j)(3)(F) provides that a parent's parental rights may be terminated if "the parent has killed through deliberate, nonaccidental act another child of the parent or has requested, commanded, importuned, CT Page 15941-dp attempted, conspired or solicited such killing or has committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent. . . ."
"In interpreting the language of a statute, the words must be given their plain and ordinary meaning and their natural and usual sense unless the context indicates that a different meaning was intended." (Internal quotation marks omitted.) In re Darlene C., 247 Conn. 1, 10, 717 A.2d 1242
(1998); see also General Statutes § 1-1 (a). The dictionary defines the noun "act" as "the doing of a thing: DEED . . . something done voluntarily . . . the process of doing: ACTION. . . ." Merriam Webster's Collegiate Dictionary (10th Ed. 1997). However, given the obvious heavy overlay of criminal terms imported into § 7a-112 (j)(3)(F),[21] it is appropriate to look also to the definition of "act" in the criminal law. Cf. Cislo v. Shelton, 40 Conn. App. 705, 712, 673 A.2d 705 (1996), rev'd in part, 240 Conn. 590, 599, 692 A.2d 1255 (1997).
Our penal code does not define the word "act." State v. Truppi,182 Conn. 449, 453 n. 2, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941,101 S.Ct. 2024, 68 L.Ed.2d 329 (1981). In the criminal law context, however, our Supreme Court has said that the word may have "any one of at least three meanings . . . (1) any bodily movement; (2) a muscular movement willed by the actor; and (3) the consequences or results of the movement. See Cook, `Act, Intention, and Motive in the Criminal Law,' 26 Yale L.J. 645, 647 (1917). The Model Penal Code, § 1.13(2), adopts the first definition of the term `act.' Mr. Justice Holmes limited the definition of an `act' to the second meaning. The Common Law, 91. See also Perkins, `A Rationale of Mens Rea,' 52 Harv.L.Rev. 905, 912 (1939)." Id. The respondent's failure to protect her daughter, that is, her failure to act, is within the ambit of none of these definitions.
It is significant that elsewhere in § 17a-112 (j), when the legislature intended to provide for the termination of parental rights based on the failure of a parent to act, it expressly said so. General Statutes § 17a-112 (j)(3)(C) authorizes the Superior Court to terminate parental rights where "the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well being." (Emphasis added) That the legislature found it necessary to specify in ground C that "acts" included "acts of . . . omission" suggests that it recognized that the word "act" otherwise did not mean failure to act. This understanding of the meaning of the word "act" in ground C, moreover, is presumptively CT Page 15941-dq the meaning to be ascribed to the same word when used in ground F. It is a "familiar principle of statutory construction that where the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance." (Internal quotation marks omitted.)Weinberg v. ARA Vending Co., 223 Conn. 336, 343, 612 A.2d 1203 (1992); see Lisee v. Commission of Human Rights Opportunities, 258 Conn. 529,539, ___ A.2d ___ (2001). The statute "is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation." (Internal quotation marks omitted.)Babes v. Bennett, 247 Conn. 256, 268, 721 A.2d 511 (1998).
Moreover, General Statutes § 17a-114a, which like § 17a-112 is contained in chapter 319a of the General Statutes, provides: "A person licensed or certified pursuant to section 17a-114 shall be liable for any act or omission resulting in personal injury to a child placed in his care by the Commissioner of Children and Families to the same extent as a biological parent is liable for any act or omission resulting in personal injury to a biological child in his care." (Emphasis added.) If "act" in § 17a-112 (j)(3)(F) is interpreted to include omissions, such as the failure to protect a child, then the reference to omissions in §§17a-112 (j)(3)(C) and 17a-114a is unnecessary. "It is a basic tenet of statutory construction," however, "that the legislature did not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) Sears, Roebuck Co. v. Board of Tax Review, 241 Conn. 749,765, 699 A.2d 81 (1997). "[T]he legislature is presumed to exercise its statutory authority . . . with the intention of creating one consistent body of law. . . . An identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result." (Internal quotation marks omitted.) In re theAdoption of Baby Z., 247 Conn. 474, 500, 724 A.2d 1035 (1999); see alsoIn re Michaela Lee R., 253 Conn. 570, 583, 756 A.2d 214 (2000) ("[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law.").
That the word "act" in § 17a-112 (j)(3)(F) does not include the failure to act is bolstered by the rule, consistently adhered to by the Supreme Court, that termination statutes are to be strictly construed. Inre Valerie D., 223 Conn. 492, 514 n. 16, 613 A.2d 492 (1992). "[T]he termination of parental rights is defined . . . as the complete severance by court order of the legal relationship, with all its rights and CT Page 15941-dr responsibilities, between the child and his parent. . . . It is, accordingly, a most serious and sensitive judicial action. Anonymous v.Norton, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935,96 S.Ct. 294, 46 L.Ed.2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. Stanley v. Illinois, 405 U.S. 645, 651,92 S.Ct. 1208,31 L.Ed.2d 551 (1972); see also In re Juvenile Appeal (83-CD), [189 Conn. 276, 295, 455 A.2d 1313 (1983)] (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. Santosky v. Kramer, 455 U.S. 745, 753,102 S.Ct. 1388,71 L.Ed.2d 599 (1982). . . . In re Jessica M., [217 Conn. 459,466, 586 A.2d 597 (1991)].
"Thus, in construing [a termination statute], which operates in the delicate realm of parent-child relationships, courts should prefer that construction which minimizes state intervention. . . . (Internal quotation marks omitted.) In re Juvenile Appeal (Anonymous) v.Commissioner of Children Youth Services, 177 Conn. 648, 662, 420 A.2d 875
(1979). In this realm, therefore, [the provisions of a termination statute] should be read with a preference for nonintrusion by the state. Id. Because of their fundamental nature, statutes authorizing state intrusion into the area of parental rights require the strictest level of judicial scrutiny. In re Juvenile Appeal (84-BC), 194 Conn. 252, 257 n. 9, 479 A.2d 1204 (1984); see also In re Juvenile Appeal (83-CD), supra, 284 (courts must keep in mind constitutional limitations imposed on state when it undertakes coercive intervention in family affairs)." In reValerie D., supra, 223 Conn. 513-14.
While other jurisdictions are divided on the issue, most courts have held that the word "act," unless otherwise defined by statute, does not include a failure to act. See, e.g., Randle v. Birmingham Railway, Light Power Co., 169 Ala. 314, 53 So. 918 (in the context of Illinois' rule barring multiple convictions for same physical act, "act" is defined as "any overt or outward manifestation which will support a different CT Page 15941-ds offense."); People v. Meredith, 209 Mich. App. 403, 531 N.W.2d 749 (1995) ("act" in criminal venue statute means overt act.); Bradbury v. Furlong,13 R.I. 15 (1880); State ex rel. Public Utility No. 1 of Okanogan Countyv. Department of Public Service, 21 Wash.2d 201, 150 P.2d 709 (1944) ("The word `acts' . . . denotes affirmative, voluntary action or performance, as distinguished from mere omission."); contra, Black Co. v.Nova-Tech, Inc., 333 F. Sup. 468 (D.Or. 1971); People v. Burden,72 Cal.App.3d 603, 140 Cal.Rptr. 282, 289 (1977); People v. Gladden,118 Misc.2d 831, 462 N.Y.S.2d 115 (1983) (the failure of a parent to perform a legal duty is an-act). As United States Supreme Court Justice Sandra Day O'Connor wrote while on the Arizona Court of Appeals, "[t]he `word act' . . . `denotes the affirmative. Omission denotes the negative. Act is the expression of will, purpose. Omission is inaction. Act carries the idea of performance. Omission carries the idea of refraining from action.'" Terry v. Lincscott Hotel Corp., 126 Ariz. 548,553, 617 P.2d 56 (1980), quoting Randle v. Birmingham Railway, Light Power Co., supra, 53 So. 920.
The decision reached by this court is consistent with a rational and reasonable interpretation of our termination statutes. When one of the circumstances contained in ground F exists, General Statutes § 17a-111a
provides with only three exceptions that the Commissioner of Children and Families "shall file a petition to terminate parental rights pursuant. . . ."[22] In addition, the commissioner may petition the court pursuant to General Statutes § 17a-111b for a determination that reasonable efforts to reunify the parent with the child are no longer appropriate.[23] A petition filed under the mandate of § 17a-111a in which the court has already found that reasonable efforts to reunify parent and child are no longer necessary, comes to the trial court with a momentum not otherwise present when DCF brings a petition to terminate parental rights based, for example, on the parent's alleged failure to achieve a sufficient degree of rehabilitation pursuant to General Statutes §17a-112 (j)(3)(B). While a parent's failure to protect one child may evidence a parental deficiency that warrants termination of parental rights, the legislature could have determined that passive failure to protect a child from assault or even killing is qualitatively different from actually assaulting or killing one's child. Not only could the legislature have found the former less heinous than the latter, but the legislature could also have found that failure to protect a child could be the product of highly unusual circumstances or of conditions more susceptible to remediation.
That the word "act" in ground F does not mean failure to act is not CT Page 15941-dt inconsistent with State v. Miranda, supra, 245 Conn. 209. As the Appellate Court in Miranda stated: "[C]onduct, creating criminal liability, may be by an act or an omission to act if within theintendment of the statute." (Emphasis added.) State v. Miranda,41 Conn. App. 333, 339, 675 A.2d 925 (1996), rev'd on other grounds,245 Conn. 209, 715 A.2d 680 (1998). Miranda involved the interpretation of a criminal statute, assault in the first degree, which provides: "A person is guilty of assault in the first degree when . . . under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person. . . ." (Emphasis added.) General Statutes § 53a-59
(a)(3). "Conduct," however, is broader than the word "act"; conduct is more inclusive. People v. Limauge, 89 Ill. App.2d 307,231 N.E.2d 599, 601 (1967) (noting that statutory definition of act in that case included a failure to act).
For the foregoing reasons, this court holds that the word "act" in § 17a-112 (j)(3)(F) does not include a failure to act, specifically, a failure to protect a child from an assault that resulted in serious bodily injury. Since the respondent's failure to act is the sole basis of DCF's claim under the statute, termination of the respondent's parental rights pursuant to that ground is denied.
 IV A. Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev. to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E., supra,61 Conn. App. 190.
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by aCT Page 15941-duchild-placing agency to facilitate the reunion of the child with theparent.
DCF was unable to provide services to the respondent because she has at all times been incarcerated and in the care and custody of the commissioner of corrections. No services were provided to Destiny, other than foster care and case management services.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
DCF was unable to make reasonable efforts to reunite the family because both the respondent and Destiny's father have been incarcerated since prior to Destiny's birth and the respondent was barred by order of the criminal court from having contact with Destiny.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
The respondent was ordered to: Keep all appointments set by or with DCF and to cooperate with DCF home visits and visits by the child's court-appointed attorney or guardian ad litem; keep child's whereabouts and your own whereabouts known to DCF, your attorney and the child's attorney; participate in parenting and individual counseling and make progress toward the identified treatment goals; submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including in-patient treatment if necessary and follow recommendations regarding aftercare treatment, including relapse prevention; submitting to random drug testing, the time and method of the testing to be at DCF's discretion; following recommendations of service providers; obtaining and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence incidents; signing releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings in court; securing and/or maintaining adequate housing and legal income; no substance abuse; no further involvement with the criminal justice system; cooperating with the office of adult probation or parole officer and complying with conditions of probation.
DCF was ordered to: "1. Take all necessary measures to ensure the CT Page 15941-dv child's safety and well being. 2 provide case management services. 3. Develop periodic treatment/permanency plan and review it with the Respondent. 4 Refer the Respondent to appropriate services . . . and monitor [her] progress and compliance. 5. Monitor the welfare of the child and the circumstances surrounding [her] care by the Respondent. 6. . . . [A]ssist in developing, implementing and monitoring an appropriate safety plan."
The respondent engaged in protracted individual counseling with Michelle May. She also participated in parenting groups, anger management, stress management counseling. Other services were not available to her because she was in prison and in a high security unit. However, DCF has not shown that the respondent failed to satisfy any steps that were within her ability to perform.
DCF endeavored to ensure Destiny's safety and provided case management services. It developed periodic treatment and permanency plans but failed to review them with the respondent. DCF was unable to refer the respondent to services because she was in the custody of the commissioner of corrections. It did seek to monitor Destiny's welfare. It did not assist in developing, implementing or monitoring "an appropriate safety plan" apart from its treatment and permanency plans. However, since Destiny has been in a safe and nurturing family, no such safety plan was necessary.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Destiny has no feelings for or emotional ties to the respondent, whom she has seen only briefly on two occasions. The court does not credit Dr. Nisenson's opinion that Destiny knows the respondent at a subconscious level as a result of biorhythms. The court credits Dr. Berkowitz' opinion that the respondent has little or no relationship with Destiny.
Destiny loves and is thoroughly bonded to her foster parents who have exercised physical care, custody and control over her since she was two days old. They are, as Dr. Berkowitz found, her psychological parents.
5. Finding regarding the age of the child. CT Page 15941-dw
Destiny is now 3 years of age.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
This finding requires consideration of the contrasting expert opinions that were offered at trial. Cf. State v. Hammond, 221 Conn. 264, 269,604 A.2d 793 (1992) (where court rejects expert testimony, there must be some basis to support the conclusion that evidence of the expert witness was unworthy of belief); Builders Service Corp., Inc. v. Planning Zoning Commission, 208 Conn. 267, 294, 545 A.2d 530 (1988) (same).
Meier stated that there is a high recidivism rate among women with a history of spousal abuse with multiple men. He further opined that the respondent is not capable of parenting without considerable treatment and a year of observation during which there could be increased visitation. This cannot be accomplished in jail since one cannot initiate independent responsible actions in jail. The respondent must learn new lifestyles outside of prison, according to Meier.
Michelle May provided counseling to the respondent in prison. Between December 30, 1999 and the time of trial she had visited with the respondent forty-seven times and had spent over 150 hours with her, working toward the goal of alleviating the respondent's "maladaptive symptoms." May testified that the respondent's experience of being under C.'s control was akin to "torture." She stated that based on what the respondent's family had said to her and on home videos she had seen, the respondent was capable of protecting her children. May opined that much of the respondent's symptomatology has lessened and that she is now more open, assertive and able to examine what happened to her. May further opined that the respondent is very unlikely to again become involved in a violent relationship because the more horrible the violence a woman has suffered the less likely she is to renew that kind of relationship. She also stated that the respondent never had a propensity for domestic violence. However, soon after saying this she seemingly contradicted herself, stating that prior to therapy the respondent was at risk for a CT Page 15941-dx domestic violence laden relationship. According to May, the respondent will be independent and financially responsible in the future.
Simply stated, May saw the respondent as a victim, as indeed she was, but also as having no responsibility for what happened to her and her two daughters. For several reasons, the court is unable to afford much weight to many of May's opinions, exculpating the respondent and attesting to her rehabilitation from dependency and passivity.
First, although May holds a master's degree in family therapy, and has practiced marriage and family therapy since 1996, she is not a psychologist or a diagnostician. She is not professionally licensed. Rather, she practices under the supervision of a licensed professional.
Second, it was abundantly clear that May had little objectivity on the matters to which she testified. She comported herself as a partisan advocate. Her written assessment reads more like a polemic than a professional's objective appraisal. For example, she refers to the respondent's "wrongful incarceration. . . ." (Exhibit F., p. 6) Her in-court mien further illustrated her partisan bent. She arrived at the witness stand with a box of what presumably were treatises and professional publications but never specifically referenced them in connection with a particular opinion she offered. She then admitted that she had experienced "vicarious traumatization" from working with the respondent. Her supervisor suggested that she reduce the frequency of her visits with the respondent because the counseling sessions were so emotionally intense for May. She admitted that she was being paid by the same outside benefactor who was paying the respondent's attorney's fees and that the respondent expected her to testify in support of her case.
Third, the court disagrees with certain factual predicates to which May testified. For example, she opined that C. did not allow the respondent to protect her children. The court disagrees. The respondent never undertook actions calculated to protect her children, even when C. was not present or when other family members of friends were present. She never called for help. She never attempted to physically oppose C. as a normal parent would have until it was too late.[24] Also, May opined that the respondent had never been beaten as a child. This is contrary to what the respondent told her own retained psychologist, Dr. Nisenson. Moreover, May claimed that she could support her opinion that a person such as the respondent was less likely to have another domestic violence relationship, adverting to the stack of books she had brought. However, she did not do so. CT Page 15941-dy
The respondent was examined and tested by Dr. Nisenson. He is a clinical psychologist who practiced for nearly twenty-nine years. Dr. Nisenson holds a doctorate in clinical psychology and has extensive and diverse experience. He is licensed as a clinical psychologist in Connecticut, New York, Florida and North Carolina and has vast experience conducting custody evaluations.
Nisenson evaluated the respondent twice. The first evaluation was conducted in early April 2000, just prior to the filing of the petition. That evaluation has been discussed supra. The second evaluation was conducted nine months later. At that time, Nisenson concluded that she had made "Olympian strides" as a result of her counseling with May. Not only was she more assertive, open and less depressed but she was very prepared to mother her children. In fact, according to Nisenson, the respondent could parent her children within sixty days. Facilitated by biorhythms, he opined, they could "suddenly be a family" since Destiny knew that the respondent was her mother at an unconscious level and that was sufficient to generate a bond. In Nisenson's opinion, there was "no chance" that the respondent would ever again become involved in a relationship in which her partner was abusive to her or her children. In his opinion, only if a person such as the respondent had severe battered women's syndrome would it take years for her to be able to parent. Since, in his opinion, the respondent had at most only mild battered women's syndrome, this was not the case.
On cross-examination, Nisenson admitted that in his April 2000 report he had adopted May's historical summary virtually verbatim. Psychologists, he conceded, should use multiple methods of data gathering. He also admitted that May was an advocate for the respondent. He chose not to note in his reports much of his own conversation with the respondent.
Nisenson opined that Francisco, while verbally abusive and occasionally physically abusive, "was not damagingly abusive" since the respondent did not suffer "major physical damage" at his hand. Nisenson then admitted that the respondent would have suffered psychological damage.
Nisenson stated that he had drawn the conclusion that the respondent had organic brain damage based solely on her Bender Gestalt and human figure drawings. No reliable testing was performed to diagnose such damage nor did he refer the respondent to a medical doctor upon reaching his conclusion. It was clear to the court that the opinion that the respondent could have sustained brain damage as a result of C.'s beatings CT Page 15941-dz was unfounded speculation.
Nisenson conceded that he would be "personally and professionally" surprised if the respondent had written letters professing her love for C. in 1999. He also stated that his opinion that the respondent could now parent a child was based in part on his assumption that C. was the only chronic abuser with whom she has had a relationship.
Berkowitz evaluated the respondent by appointment of the court. Berkowitz has been a clinical psychologist for thirty years, having received her masters degree and doctorate from the State University of New York at Buffalo. She has been licensed in Connecticut since 1971 and has served as a special master in the custody dispute mediation program of the regional family trial. docket. She is a registered custody evaluator and diplomate of the Academy Register of Custody Evaluators. She also is diplomate in child custody evaluations of the American Board of Psychological Specialties. Areas of emphasis in her private practice include forensic evaluations for family issues such as abuse and neglect. Her recent continuing education includes study of battered women's syndrome and treatment of clients with post traumatic stress disorder.
Berkowitz determined from testing the respondent that her intellectual functioning fell within the lowest fifth of the population. As a result of the test results, she disagreed with Nisenson's opinions that the respondent had a learning disability and organic brain damage. However, she opined that the respondent functioned at such a relatively low level that she "did not appear to possess the skills and knowledge that would provide others with confidence that she could independently live, work, pay bills, raise children and stay away from dysfunctional relationships" at the same time.
In her interview with Berkowitz, the respondent "reported that she believed that male partners beating females was the norm, what she had always seen, and that it was the women's fault when it happened." As she stated in her report, Berkowitz "was impressed with [the respondent's] extreme vulnerability to someone like Mr. [C.], prior to his exerting full control. She continued to be so desperate for someone to love her and take care of her (and the children), that she would easily submit to his overtures and insistence on moving in. Her daughter's life, and almost her own and Crystal's as well, was sacrificed to her passivity, dependency, and desperation for love and affection. Asked if there was anything else she could have or should have done, that could have prevented this tragedy, she thought for a few minutes, and then responded CT Page 15941-ea negatively. . . . She . . . was appalled at his treatment of Keriana, mostly, and of Crystal, and repeatedly begged him to stop, but was unable to get him to refrain from beating the children. . . .
"Asked for specific reasons she did not want her children hit, [the respondent] admitted she was concerned about their father's reaction to the abuse when he came to see them after release from prison. She also added that she thought it was wrong to hit or yell at children. . . ." Berkowitz opined that the respondent had low self esteem and was at least moderately depressed. It was also her opinion that despite the respondent's having begun counseling and participating in prison groups, she has significant personal and psychological issues to deal with and "there was no indication that she would fare better in the future, in protecting herself or her children from significant victimization and abuse."
Although opining that the respondent "was mainly a victim not a perpetrator," Berkowitz wrote in her summary that "[b]y her own dysfunctional family of origin and upbringing, [the respondent] was a prime candidate for entering into and staying in abusive relationships. . . . [She likely] carried diagnoses of PTSD [Post Traumatic Stress Disorder], clinical depression and Battered Women's Syndrome. Although these configurations certainly help us to understand her behavioral paralysis, motivations, fearfulness and inability to protect her children, they cannot really excuse her from some psychological responsibility for what happened, in this psychologist's opinion. One primary goal of a good mother is protection — keeping one's children from harm, doing whatever it takes to prevent them from falling prey to danger. Unfortunately, [the respondent] described herself as unable to overcome her fears sufficiently to carry out the primary function. Nor is there reason to feel assured that she has become psychologically immunized against future abusive relationships. The amount of therapeutic work necessary for her to remediate or rehabilitate could take years to result in sufficient progress. . . ." In Berkowitz' opinion, for the respondent to be reunified with Destiny, the respondent would have to (1) be out of prison, (2) attain a stable lifestyle, including adequate housing and income, (3) engage in individual and group therapy for battered women, so that therapists could assess her progress, including her male relationships. This would necessarily take years. This coincided with Dr. Meier's opinion.
However, Berkowitz was mistaken in assuming that the respondent had not attempted to make contact with Destiny. Clearly, she did. Also, in the parent-child interaction that Berkowitz observed between the respondent CT Page 15941-eb and Destiny, the respondent behaved very appropriately, exhibited some good parenting skills and was safety-conscious. Significantly, however, despite Berkowitz' suggestion that the respondent use the session, at which the foster mother was present, to obtain information from the foster mother about Destiny's health, personality and development, the respondent failed to do so. This, as Berkowitz opined, "was probably congruent with her general passivity." Despite the positive parent-child interaction, Berkowitz concluded that there was "nothing to support the idea that [the respondent] would be any better able to protect her children from abusive male partners in the future."
"The testimony of professionals is given great weight in parental termination proceedings. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony he reasonably' believes to be credible. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . ." (Citations omitted; internal quotation marks omitted.) In re CarissaK., 55 Conn. App. 768, 781-82, 740 A.2d 896 (1999); see also, In re DeanaE., 61 Conn. App. 197, 208, 763 A.2d 45 (2000), cert. denied,255 Conn. 941, 768 A.2d 949 (2001).
While the respondent may have grown in assertiveness, as May opined,[25] persons such as the respondent, Meier cautioned in his 1999 report, often conceal strong feelings of inadequacy and self dissatisfaction behind a facade of assertiveness. (Exhibit 5, p. 8) Even if the respondent is more assertive today than she was in July 1998, "[i]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) In re Daniel C., supra,63 Conn. App. 354. Moreover, whatever progress the respondent has seemingly attained has been made in the structure and anomalous culture of a penitentiary. She has never been tested in the untethered freedom of an open society.
Moreover, Nisenson's opinions that the respondent is ready to assume the responsibilities of parenting, taking custody of Destiny in sixty days, with "no chance" of ever again becoming involved in an abusive relationship are nothing short of incredible. The court credits the opinions of Berkowitz and Meier that it will require years for the CT Page 15941-ec respondent to achieve rehabilitation, including observing her in gradual reunification settings outside of prison.
Considering all of evidence, including that adduced after the adjudicatory date, the court finds by clear and convincing evidence that the respondent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes § 17a-112 (j)(3)(B).
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The respondent has not been prevented from maintaining a meaningful relationship with Destiny by the unreasonable act or conduct of C., Destiny's biological father, or the unreasonable act of any other person or by her economic circumstances. Although DCF not only prevented the respondent from visiting with Destiny but also prevented the respondent from sending cards and gifts to her, this was consistent with the order of the criminal court and with Destiny's best interests. That is, it was not unreasonable.
 B.
Although in determining whether to grant a petition to terminate parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112
(k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916 (2000); "[t]he seven factors . . . serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." In re Quanitra M., 60 Conn. App. 96, 104, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). "The trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability CT Page 15941-ed of its environment." (Internal quotation marks omitted.) In re ShyinaB., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000). "In addition, the genetic bond shared by a biological parent and . . . her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . ." (Internal quotation marks omitted.) In re Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999).
In addition to the foregoing facts, the court has carefully considered the respondent's claims that the foster parents have themselves been deficient. The foster parents also are Destiny's prospective adoptive parents, and "In re Baby Girl B., [supra, 224 Conn. 275], recognized that once a ground for termination has been shown to exist, the suitability and circumstances of adoptive parents, in an appropriate proceeding, [may] be considered." (Internal quotation marks omitted.) In re VincentD., 65 Conn. App. 658, 666, ___ A.2d ___ (2001).
It is true that the foster parents have at times been delinquent in advising DCF of certain matters, as they were obliged to do. For example, they failed to advise DCF of a minor injury Destiny sustained at the beach and failed to promptly inform DCF of their new address when they moved. Also, for a time, their home was too small by DCF's standards to accommodate the number of children they had. These lapses, however, pale in significance when compared with the love, security and care they have given Destiny. More disturbing is either the naivete or lack of candor exhibited by the foster mother in her testimony. Nonetheless, the court finds that the foster parents have provided Destiny with a good home and that they will likely continue do so in the future.
The respondent has not rehabilitated and there is no reason to believe that she will be rehabilitated within a reasonable time. She has been in prison since 1998 and remains there still, with no evidence that her early release is foreseeable.
Destiny is healthy and developmentally on target. She is loved and well-cared for by her foster parents and two older brothers in a stable, nuclear family. The pernicious cycle of female dependency, submissiveness and passivity that wrought the death of her sister Keriana should thereby be broken.
Destiny's interests in sustained growth, development, well-being, and continuity and stability of its environment cannot be met by leaving her in foster care. As Dr. Meier attested, a child of Destiny's age should not be in foster care more than two years. There is no reason to further delay Destiny's adoption and risk "[t]he well-known deleterious effects CT Page 15941-ee of prolonged temporary placement on the child. . . ." In re JuvenileAppeal (83-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). By clear and convincing evidence, the court finds that it is in Destiny's best interests for her mother's parental rights to be terminated.
 V
The petition is granted. The court terminates the respondent's parental rights. The foster parents shall be given the first opportunity to adopt Destiny. The Commissioner of the Department of Children and Families is appointed statutory parent for Destiny for the purpose of securing a permanent adoptive family for her. The commissioner shall file with this court no later than 30 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 10th day of December, 2001.
BY THE COURT
Bruce L. Levin Judge of the Superior Court